IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON
Assigned on Briefs May 5, 2009

**AMBRECO SHAW V. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Shelby County**
**No. 02-05450     John T. Fowlkes, Jr., Judge**

_____

**No. W2008-02064-CCA-R3-PC - Filed June 30, 2010**

_____

Petitioner, Ambreco Shaw, appeals the dismissal of his petition for post-conviction relief in which he alleged that he received ineffective assistance of counsel at trial. Specifically, Petitioner contends that (1) counsel failed to fully investigate all possible defenses; (2) counsel failed to adequately meet with Petitioner and allow him to be involved in his defense; (3) counsel failed to properly convey and explain settlement offers; (4) counsel failed to properly advise Petitioner concerning his right to testify; (5) counsel improperly allowed Petitioner to appear at trial in prison clothing; (6) counsel failed to request a mental evaluation in a timely manner; and (7) counsel failed to cross-examine witnesses and provide proof at the sentencing hearing. After a thorough review of the record, we conclude that Petitioner has failed to show that his trial counsel rendered ineffective assistance of counsel and affirm the judgment of the post-conviction court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Affirmed**

THOMAS T. WOODALL, J., delivered the opinion of the Court, in which J. C. MCLIN and CAMILLE R. MCMULLEN, JJ., joined.

R. Andrew Hutchinson and Matthew S. Lyons, Memphis, Tennessee, for the appellant, Ambreco Shaw.

Robert E. Cooper, Jr., Attorney General and Reporter; Melissa Roberge, Assistant Attorney General; William L. Gibbons, District Attorney General; and Paul Hagerman, Assistant District Attorney General, for the appellee, the State of Tennessee.

## OPINION

### I. Background

Following a jury trial, Petitioner was convicted of second degree murder, a Class A felony, and was sentenced to twenty-four years in the Department of Correction. On appeal, this Court affirmed the conviction and sentence. *State v. Ambreco Shaw*, No. W2003-02822-CCA-R3-CD, 2004 WL 2191044 (Tenn. Crim. App. Sept. 28, 2004)(app. denied May 23, 2005). The facts surrounding Petitioner's conviction were summarized by this Court on direct appeal as follows:

> The victim's mother, Mary Carter, testified that the victim left her home on the morning of October 10, 2001, to go to an apartment in the Dixie Homes, a Memphis public housing development where his girlfriend lived with their five-year-old son. She stated that she received word later that day that the victim had been shot and was at the hospital. Upon her arrival at the Regional Medical Center, the hospital chaplain informed her that the victim was dead.

> The victim's fiancée, Kenia White, testified she and the victim were returning to her second story apartment after dropping their son off at school when they encountered the defendant, whom she knew as "B," lounging beside the balcony in front of "Renee's" apartment, located a few doors down from her home. The victim spoke to the defendant, telling him he would see him that afternoon, and she and the victim retired to her apartment to sleep. At about 2 p.m., the victim's friend, Brian, and a man she did not know stopped by her apartment. The men asked the victim if he knew where they could get some drugs, and he replied that he did not but would check with some men at Renee's apartment. Ten or fifteen minutes after the victim returned from Renee's apartment, the defendant came to White's end of the porch and "in broad daylight showed Brian the dope in his hand."

> The victim chastised the defendant, telling him that he could have asked to step inside the doorway rather than conducting his transaction in front of their apartment door. White explained that her apartment building, which was commonly known as "the dope track," was constantly patrolled by the police. Although she could not hear the defendant's response, it caused the defendant and the victim to "hav[e] words with each other" and to exchange curses. She calmed the men down, and the victim told the defendant to keep the drugs on his end of the porch. The defendant left, and the victim resumed drinking his beer and talking and laughing with his friends.

White estimated it was ten to fifteen minutes later when the frowning defendant, whose t-shirt was "cocked up in the air" as if he had "stuck something in [his] pants and ... forgot to put [his] t-shirt down," met her and her son as they were headed down the stairs to the store. Thinking nothing of it at the time, she continued past him and down the stairs. However, when she heard the victim curse again in response to something the defendant said, she stopped at the bottom of the stairs and called up to the defendant, "Dog, boy, you that mad because he told you we don't want you in front of our door? We don't care how many drugs you sell. Just keep it away from in front of our door." The defendant cursed her in reply, and the victim told her to stop arguing with him and to continue on her way.

Hearing no further argument between the men, White walked to her car, which was parked in front of the stairs to her apartment building. At about the time she inserted her key in the car door, she heard gunshots, looked up, and saw the defendant with his arm extended shooting at the victim. The victim fell backwards in an attempt to flee, while the defendant, who was "skipping backwards" toward the stairs, continued firing his gun. White testified she heard multiple gunshots and saw the defendant's arm extended, but was unable to see the defendant's gun because of the balcony guardrail. She said the victim was also hidden from her view after his fall. However, based on seeing her apartment door open and then shut, she assumed he ran in a crouching "duck walk" into her apartment to escape the defendant.

White testified she ran with her son to the apartment building and started up the steps, only to encounter the defendant, gun in hand, on his way down. The defendant stopped two to three feet from her and pointed his pistol directly at her face. She grabbed her son, fell to the ground, and "covered up." Next, she heard a "click," which she interpreted as the defendant's attempt to shoot her with his pistol, which was out of bullets. When she sat up, she saw the defendant running toward the corner of the apartment building where he disappeared from view.

When White reached her apartment, the victim unlocked and opened the door from the inside and instructed her to call 9-1-1, telling her he had been shot in the leg. Although she saw no blood and he initially appeared to be all right, he soon broke out in a sweat, sat down, and began foaming at the mouth. A police officer arrived as she was on the telephone with the 9-1-1 dispatcher, and remained with the victim while she took a second police officer to the

defendant's mother's residence a few streets away. By the time she returned to the apartment, the paramedics had already taken the victim to the hospital.

White testified she went from her apartment to the police station, where she gave a statement and identified the defendant from a photographic lineup, and then to the hospital, where she learned that the victim was dead. She made a positive courtroom identification of the defendant and testified she was certain the victim was holding a beer in his hand at the time of the shooting. However, she acknowledged on cross-examination that she did not know what had transpired between the men immediately before the shooting.

Sergeant Marlon Tabor of the Memphis Police Department testified he was assigned to the Memphis Public Housing Bureau in October 2001, and was patrolling in the Dixie Homes development on October 10 when he heard what sounded like gunshots and someone told him a shooting was taking place around the corner. There, he saw a group of people standing in front of an apartment building pointing up to a second story apartment. He went up the stairs, where he was met by Kenia White, who informed him her boyfriend had been shot. The victim, who was lying on his back in a hallway inside the apartment, had "small trickles of blood coming out of him," was laboring to breathe, and appeared to Sergeant Tabor to be "in [a] pretty serious condition." Nonetheless, he was able to reveal the identity of his assailant and to indicate what led to the shooting:

I asked him several times who shot him and he finally said someone named B. And he told me kind of what happened to him. He said that him and B or someone got into an argument and he was shot. It was something dealing with drugs. He was kind of saying it in a lot of broken English. I had to get down really to hear what he was saying.

Sergeant Tabor testified White informed him that "B" lived around the corner and took him to the defendant's mother's apartment, located about a block away in the same housing development. The defendant was not there, and he was unable to locate him at that address despite returning to the apartment "on multiple occasions" over "multiple days." On cross-examination, Sergeant Tabor testified that the Dixie Homes development was a high crime area "[a]t one time," but that "the crime rate [was] fairly low i[n] that area now."

Memphis Police Officer Katie Ward, who was assigned to the Dixie Homes area in October 2001 and was one of the officers who responded to the

shooting, testified the victim was lying in the hallway of the apartment when she arrived, was sweating, and was not moving. The victim told her and other officers that "B" shot him. A young woman informed them where "B" lived, and she and several fellow officers went to that location but were unable to find him. On cross-examination, Officer Ward readily acknowledged that the Dixie Homes development was a "high crime area."

Memphis Police Officer Mike Schafer testified he and fellow officers went to the Oak Manor Apartments on March 3, 2002, in response to a Crime Stoppers tip that the defendant was outside one of the apartment buildings. The defendant fled at sight of the officers, but was captured after running approximately fifty yards.

Dr. Theresa Allen Campbell, the Shelby County medical examiner who performed the autopsy of the victim's body, testified the victim's cause of death was multiple gunshot wounds, consisting of a fatal gunshot wound to the left lower abdomen in which the bullet perforated the left common iliac artery and the left common iliac vein, causing the victim to bleed to death, and a gunshot wound to the right thigh in which the bullet lodged in the muscle but did not hit any vital structures. The victim's drug test was negative. His blood alcohol level was .02, which was consistent with his having consumed a beer at or near his time of death. In addition to the gunshot wounds, the victim had abrasions on his left hand, an abrasion on his forearm, and red linear contusions on his chest. Dr. Campbell agreed the abrasions to the hand and arm were consistent with the victim's having fallen on concrete, and testified that the patterned linear contusions on his chest were more consistent with medical intervention than with a punch. On cross-examination, Dr. Campbell testified that the victim was five feet, ten inches tall.

Following the trial court's denial of his motion for judgment of acquittal, the nineteen-year-old defendant took the stand in his own defense. He began his testimony by admitting he shot the victim, supported himself until the time of his March 3, 2002, arrest by selling crack cocaine, and had prior convictions for theft of property under $500, theft of property over $500, and theft of property over $1000. He claimed, however, that the shooting occurred during a physical altercation in which the victim made a move as if to reach for a weapon. According to the defendant's account, he was leaning against the balcony rail talking to Renee when the victim's friend Brian and Brian's associate approached the victim outside White's apartment. The victim called to him, and he walked down to the victim with the intention of telling the

victim's friends where they could find some drugs. The defendant testified he had no drugs with him at that time, but if he had, he would have sold them to the victim's friends.

The defendant testified a verbal confrontation ensued between him and the victim, which was immediately followed by the victim's punching him in the chest. The defendant stated he was 5'6" or 5'7" and stumbled backwards after the victim punched him. As he did so, he saw the victim reach down toward his pants pocket. Believing the victim was going for a gun, he pulled the .22 revolver he constantly carried for self-protection out of his rear pocket, fired two or three shots at the victim, and then fled. The defendant insisted he had no intention of killing the victim. He said he fired downwards and thought he had shot the victim in the leg.

The defendant testified he dropped his gun on the apartment stairs as he fled. He said he ran to a nearby wooded area, where he hid for approximately an hour and a half until "the commotion had died down." Afterwards, he went first to a girlfriend's house, and then stayed in a series of motels, where he supported himself by selling drugs, until he was ultimately captured. He explained his failure to turn himself in by stating that he was afraid of what would happen to him and his March 3, 2002, flight from the police by stating he overreacted out of fear that the officers would shoot him. He said he was "very sorry" about what had happened, "never intended for things to get that far," and would never again carry a gun.

On cross-examination, the defendant testified the victim initiated the argument and physical altercation. He claimed not to have known what the fight was about and to have merely reacted to what he had perceived as a threat. He admitted he never saw the victim with a gun. He denied he pointed his gun at White or her son, testifying he no longer had his weapon at the point he passed them on the stairs. He acknowledged he hid from the police from the time of the shooting until his capture, but also claimed he had tried to turn himself in. According to his testimony, he telephoned the "homicide squad" in January 2002, spoke to someone to whom he provided his name, the name of the victim, and the date of the shooting, and was told by that person that he was not wanted for anything.

*State v. Shaw*, 2004 WL 2191044, at *1-5.

## II. Post-Conviction Hearing

Petitioner testified that he wanted to proceed at trial on a theory of self-defense, which he communicated to trial counsel. He said that he also gave trial counsel the names and phone numbers of several individuals to call as witnesses at trial, including Larry Wilson and Renee Manning. He did not know the "real names" of the others that he wished to call. Petitioner testified that he told trial counsel that he was being attacked at the time of the shooting, and the victim appeared to be pulling a weapon from his pants. Petitioner then opened fire. He told trial counsel that Mr. Wilson broke up the initial fight between Petitioner and the victim, and Ms. Manning was standing beside Petitioner when the victim attacked and punched him. Petitioner testified that trial counsel spoke with the two witnesses, but they were never called to testify at trial. Petitioner claimed that trial counsel told him that their story was unbelievable and that it would be hard to prove self-defense. He said that he and the victim began fighting because he had words with the victim's girlfriend. Petitioner testified that he knew the victim because they all lived on Pauline Circle, and the victim was always around. He also said that the victim was known to carry a gun. Petitioner felt that his trial would have had a different outcome if Ms. Manning and Mr. Wilson had testified on his behalf.

Petitioner testified that trial counsel did not really meet with him, and counsel did not respond to his letters. He then wrote letters to the trial judge and the Board of Professional Responsibility requesting new counsel because it was difficult to communicate with trial counsel, and counsel did not raise the issues that he wanted raised. He said that the trial court refused to appoint him new counsel because the trial was too far advanced. Petitioner testified that on the trial date, counsel informed him of the State's plea offer of thirteen and a half years. He did not accept the offer because he assumed that Renee Manning and Larry Wilson would testify that he acted in self-defense. When they were not called as witnesses, he took the stand to testify because trial counsel advised him that it was the only way to prove self-defense. Petitioner admitted that trial counsel told him what to "look for" when testifying on his own behalf; however, he said that he did not understand "it would be as harsh and as crucial as it was." He knew that he would be cross-examined about his prior drug offenses. Petitioner said that he did not hear Kenia White testify that he pointed a gun at her when she encountered him in the hallway. Petitioner testified that trial counsel showed him a copy of the investigator's report, but he did not understand it. He said that his family delivered "civilian clothes" to the jail for him to wear at trial; however, Petitioner was not allowed to change. He appeared at trial in his prison clothing.

Petitioner testified that he has a history of mental illness. He said: "For a long time when I was younger I had some behavior issues, and I had a lot of issues with you know just me being uncontrollable behavior and just down spouts of depression or whatever."

Petitioner testified that he first received medication in 1998. He said that he was on medication at the time of trial, which affected his ability to understand what was going on around him. Petitioner testified that he was taking Paxil, Geodine [sic], and Moxitine [sic]. He said,

> It was a lot of - - I was on some for depression and some for psychotic distemper and mental behavior or whatever. I really can't remember all of them, but I was switched from different medications often. They was [sic] raising my dosage higher and higher almost every month that I was being evaluated.

Petitioner testified that he received a mental health evaluation prior to his sentencing hearing. He said that no one testified on his behalf at the sentencing hearing, and he received a twenty-four-year sentence. He later learned that his encounter with Kenia White in the stairwell was used as an enhancement factor.

On cross-examination, Petitioner did not remember telling trial counsel that the victim had a knife. He also did not remember telling counsel several different accounts of how the offense occurred. Petitioner was not aware that Larry Wilson and Renee Manning would have testified that Petitioner had a verbal argument with the victim and that Petitioner left the scene and returned brandishing a gun. Petitioner claimed that he was standing on "the rail" the entire time. He said that the argument never stopped, but it escalated when he said something to Ms. White. Petitioner testified that he did not leave the scene until after shots were fired. He said that he did not hide out after the shooting and that trial counsel told him to testify that he went from hotel to hotel over the course of months hiding out and watching out for police. Petitioner claimed that instead of hiding, he was living here and there "mainly adrift." He further claimed that trial counsel told him to testify that he and the victim were arguing because of a drug transaction; however, Petitioner claimed that he was not a drug dealer. He said that he "[s]omewhat" lied during the trial when he testified that he carried a gun because he was a drug dealer and had been robbed. He said that he had been robbed, but he was not a drug dealer, and trial counsel told him to testify that he was a drug dealer.

Petitioner denied refusing to cooperate with the doctors during his mental health evaluation. He claimed that he completed the tests, but the doctors asked for a "postponement." He did not have any idea why they prepared a report stating that he refused to cooperate. Petitioner testified that he did not fully understand the State's thirteen and a half year offer, so he rejected it. He said:

> Well, I asked how long would I have to have to stay incarcerated, and I asked under what conditions would I have to stay in jail under, and I asked several

-8-

things that I really didn't know about. I asked him about the sentence, and he said he really couldn't explain that he would come back in the courtroom to [sic] under what percentage or whatsoever.

So, when he came in the courtroom, Mr. Hall he came back out, and he told me I needed to dress out for trial, asked me did I have any trial clothes. It never was said or spoken of again.

Petitioner testified that he then assumed it was a "dead" issue. He admitted that he had prior theft convictions.

Kathy Byrd is a criminal investigator for the public defender's office, and she investigated Petitioner's case. She interviewed Larry Wilson, Renee Manning, and Kenia White. There were other potential witnesses who she was unable to locate. Ms. Byrd testified that she first interviewed Kenia White, the victim's girlfriend, on January 8, 2003. Ms. White said that she encountered Petitioner in the stairwell, and he pointed a gun in her face and pulled the trigger. However, the gun was out of live ammunition. Ms. Byrd next interviewed Renee Manning, who was an eyewitness to the shooting. Ms. Manning said that she heard four to five gunshots, but she never saw a gun. She had no doubt that Petitioner shot the victim, but she thought that the victim also had a gun that was not recovered.

Ms. Bryd next interviewed Larry Wilson. Mr. Wilson said that he heard the victim threaten to kill Petitioner the morning of the shooting. He also saw the victim carrying a "chrome .38 with a brown handle." He did not see Petitioner with a gun. Concerning the shooting, Ms. Bryd took the following statement from Mr. Wilson:

"They got out and heard arguing, and he heard victim say, 'I'll get your punk ass now,' and he saw the victim bum rush the door like he was going to do something to somebody."

* * *

"He saw the victim, defendant and two other guys upstairs. He has no idea who the other two guys were. [Kenia] told Larry, 'You get Ambreco and I'll get Michael.' They ran upstairs. Before they got there they heard gunshots four or five in a row. When they did get upstairs, everybody was gone. They had run down the end stairs not the stairs in the middle because they did not pass anyone on the way up. I asked if Ambreco put a gun to [Kenia]'s neck and threatened to kill her, and he said, 'No. Ambreco also went down the end stairs."

-9-

Mr. Wilson told Ms. Byrd that Kenia White could not see who shot the victim from where she was standing, and she was lying if she said that she witnessed the shooting. Ms. Byrd testified that she gave trial counsel her reports from the investigation.

On cross-examination, Ms. Byrd testified that she is not a police officer, and the witnesses were not under oath during the interviews. She was aware that Renee Manning knew Petitioner through her boyfriend, Larry Wilson. Ms. Byrd was aware that Ms. Manning had spoken with police and told them that she did not see the victim with a gun on the day of the shooting. She could not say if she knew that Petitioner and Larry Wilson were friends; however, she was aware that Wilson knew of the victim and Petitioner. Ms. Byrd knew that Mr. Wilson was a five-time convicted felon, and she was also aware that he told police that he did not see the victim with a gun on the day of the shooting. Mr. Wilson had also told police that the altercation occurred because the victim did not want Petitioner selling drugs in front his apartment. The victim had threatened to turn Petitioner in to police for selling drugs there. Ms. Bryd said that Mr. Wilson told her and the police that the victim had been using drugs and was high at the time of the shooting; however, the medical examiner's report revealed no drugs in the victim's system.

Trial counsel testified that he began representing Petitioner in general sessions court, where Petitioner had a preliminary hearing, and counsel represented Petitioner in criminal court. Trial counsel testified that he met with Petitioner on multiple occasions. At trial, during the *Momon* hearing, Petitioner acknowledged that he and counsel had discussed the facts and circumstances of the case on "numerous occasions." Trial counsel did not feel that there was any lack of communication between Petitioner and himself.

Trial counsel testified that Petitioner talked of self-defense, but his version of the facts varied. Counsel testified, "Well, on one occasion he told me that Mr. Carter, the deceased Mr. Carter, had a knife [,] another occasion he had a gun, another occasion he told me not only did Mr. Carter pull a gun but he fired the gun twice." Petitioner also wanted him to find out if a "[g]unshot residue kit" was performed on the victim. Concerning the facts of the case, trial counsel testified:

> And fact pattern-wise something that is hinted at during the earlier testimony was that Ms. Manning was, of course, was in fact a friend of Mr. Shaw's who lived a few doors down, second floor [of] this particular building at Dixie Homes from Ms. [Kenia] White where Mr. Carter stayed at occasionally, and it was high crime area. I believe that came out during the trial.
>
> And that two people that Mr. Shaw's [sic] testified to apparently one of them had approached Mr. Carter, and Mr. Carter apparently facilitated what was

going to be a drug transaction between Mr. Shaw and somebody named Brian. Nobody knew who [sic] that last name was.

And so there was initial verbal exchange about both [Kenia] and [Kenia] quoted Mr. Carter as stating this conversation he was having with Mr. Shaw was he didn't care how Mr. Shaw made his living just don't make his transactions in front of their door because it was a high crime area, and I believe Mr. Carter had told Larry White (sic) that's been referred to that he's going to start video taping all of this that again don't care where you sell it just don't do it in front of my place, turn you in.

And that [sic] Mr. Shaw left that immediate area, went back to Ms. Manning's home. Ms. Manning told - - I'm [sic] make sure I have this correct. That Mr. Shaw returned to her apartment two or three doors down to retrieve his jacket then returned. Then was going back toward Mr. Carter and the conversation began again and escalated.

And the theory of the government, as you well know, was that Mr. Shaw left came back from Ms. Manning's apartment at that time with [a] jacket. He'd gone to get his jacket. He came back and he finished what started out as a one-sided fistfight with a gun. Ms. Shaw as I said told me on one occasion knife pulled on him, another occasion a gun is pulled on him, another occasion Mr. - - the Late Mr. Carter shot at him.

Trial Counsel said that when Petitioner testified at trial, he did not say anything about a knife or shots fired. Petitioner, like Mr. Wilson, told him that the victim was highly intoxicated and appeared to be high on narcotics. However, the autopsy report showed no narcotics, and the victim's alcohol level was .02.

Trial counsel said that he would never advise a client to lie under oath. He said that the jury heard evidence of Petitioner's drug dealing through Ms. White who testified that the argument between Petitioner and the victim began over the fact that the victim did not want Petitioner making "hand-to-hand transactions" in front of his door. Trial counsel testified that he did not tell petitioner to lie about where he had been living for the five months after the shooting. He said:

When I told him he had to tell the truth about where he had been during those five months, and he testified I believe that he hid out in some woods near the what used to be near Dixie Homes for an hour, hour and a half until the

commotion died down, and then he went to a friend girl's house and never told me who that was.

So I asked him where did you live during that time. He said motel to motel, on the street stay, stay here, say [sic] there. So then you'll just have to testify to that, but you're going to have to explain why you didn't turn yourself in. If it was truly self-defense, then it's going to be a lot easier for a jury to believe that if you turn yourself in quickly, maybe even the next day with some kind of reflection, but five months later is not going to help him.

I told him he'd just have to be truthful about where he'd been living, and what he'd been doing. He had to support himself somehow.

Trial counsel testified that there was a pretrial *Morgan* hearing about Petitioner's prior convictions, two of which were felonies, and the trial judge allowed them because they involved dishonesty.

Trial counsel testified that he received open-file discovery in Petitioner's case, which included copies of statements by Ms. White, Ms. Manning, and Mr. Wilson. He made copies of the statements and forwarded them to Petitioner. Trial counsel testified that he asked the investigator, Ms. Byrd, to interview the witnesses. He gave her a copy of the entire file. Trial counsel said that if either Ms. Manning or Mr. Wilson had placed a gun in the victim's hand, he would have called them to testify at trial. He was reluctant to call either of them to testify because their statements to Ms. Byrd were in some instances at odds with what they told police and with each other. Trial counsel testified that Mr. Wilson was not available for police to talk to about the incident until he was under arrest for marijuana charges. He said that Mr. Wilson told police that he did not see the victim with a gun on the day of the shooting; however, he told Ms. Byrd that he had seen the victim with a gun earlier in the day. Trial counsel further noted that Mr. Wilson said that the victim was drunk and high and that his speech was slurred; however, the autopsy did not support the claim. Trial counsel also noted that Mr. Wilson had four or five felony convictions. Trial counsel testified that Petitioner and Ms. Manning were close friends, and "Renee's is where he made his money." He said that Ms. Manning told police that on the day of the shooting, only Petitioner had a gun. However, she told Ms. Byrd that Petitioner never had a gun. She also said that Petitioner had returned to her apartment after the initial altercation to retrieve his jacket. Trial counsel felt that this was going to bolster the State's theory that Petitioner left and returned with a gun. He noted that Kenia White's statements were consistent throughout the case. Trial counsel did not recall if Ms. Manning or Mr. Wilson was outside the courtroom during trial.

Trial counsel testified that Petitioner's clothing was delivered to the jail before trial; however, it was lost. Concerning this issue, trial counsel said:

> Now, let me tell you this while I'm thinking about it if I could. A couple of things, the clothes I can't remember whether I brought him clothes or whether I directed his family to bring clothes as the Sheriff requests us to do. I cannot recall, but they were lost in the jail, and so that's the business about the clothes.
>
> I did talk to his mother, and she advised - - I talked to his mother by telephone. She advised me clothes had been delivered, came up, didn't have them on, and I thought, well, he's been in jail this long. Self-defense, [p]articularly, if a jury finds - - if the proof develops that self-defense is a possibility for them to consider, then perhaps if they saw he's been in jail this amount of time for this, kind of a subterfuge I suppose.

The State then asked the following question: "Strategically you thought that maybe the jury knowing he'd been in jail [sic] year or two may incur to his benefit?" To which trial counsel replied: "Sympathize. Sympathize a little bit."

Trial counsel testified that Petitioner received a plea offer to plead guilty and receive a sentence of thirteen and one-half years. The offer began as twenty years with no parole and went to fifteen years. Counsel said, "I advised him thirteen and a half. All I did not [sic] have to come check on the percentages, and I told him that - - I didn't have to come check the percentages. I told him what all that was." Trial counsel testified that he told Petitioner that if he lost at trial, "he could very conceivably get close to double that thirteen and a half." Petitioner ultimately received a twenty-four-year sentence. Trial counsel testified that Petitioner made the decision to testify, as was stated in the "jury-out Momon hearing."

On cross-examination, trial counsel was sure that he explained the nature of the charges to Petitioner, including the difference between second degree murder and voluntary manslaughter, and that with Petitioner's theory of the case, they would try for voluntary manslaughter. They also discussed the content of the statements obtained by Ms. Byrd. He did not recall attempting to contact Ms. Manning or Mr. Wilson after receiving Ms. Byrd's report. Trial counsel said that he pointed out inconsistencies to Petitioner and the fact that Mr. Wilson did not come forward until he was arrested for possession of more than one hundred grams of marijuana. He told Petitioner that he did not know if Mr. Wilson's and Ms. Manning's statements would be helpful to Petitioner. Trial counsel said:

-13-

I told him that that was a gamble I didn't think we needed to take, and that it was a judgment call on my part. I never ever heard that these folks were outside this courtroom during the trial. If I had, not only would I have talked to them, I would have demanded they wait outside since I called for the rule.

He advised Petitioner to take the stand in his own defense because he was claiming self-defense, and no one, other than Petitioner, placed a gun in the victim's hand at the time of the shooting.

Concerning evidence of adequate provocation, trial counsel testified that the proof at trial indicated that Petitioner left and returned with a gun to finish a physical altercation. He said:

The adequate provocation a slap in the face and shooting him, finishing [sic] fistfight with a gun and a fistfight - - I wouldn't call it a fistfight. I don't think there was ever any testimony about Mr. Shaw striking him but this gentleman had struck him I believe Mr. Shaw testified once, and that he reacted by shooting him.

And the way I tried to argue the knowing element to the jury, Your Honor, was all the testimony, everybody, Mr. Shaw's testimony, Ms. [Kenia] White's testimony was they were only a couple or three feet apart, and that if he was knowingly trying to kill this gentleman, he would not have shot him in the stomach. He would have shot him in the head. He was close enough I think even I could have hit somebody in the head from that distance.

And so if he was really trying to kill him, knowingly kill him, his testimony and the medical examiner's testimony that the shot was near the navel somewhere, and I believe a shot to the leg was consistent with his testimony, at least his direct testimony. Cross-examination didn't help him very much, but was that he was trying to protect himself to what was at least a perceived danger, and if he was really wanting to kill him, he would have shot him in the head or chest.

Trial counsel testified that he obtained the victim's arrest history and knew that he had a prior conviction for carrying a dangerous weapon. He also had a pending weapons charge. Trial counsel testified that he considered asking Ms. Byrd to go out into the neighborhood to ask about the victim's propensity for violence; however, he did not feel that anyone would be forthcoming with information.

## III. Standard of Review

A petitioner seeking post-conviction relief must establish his allegations by clear and convincing evidence. T.C.A. 40-30-210(f). The trial court's application of the law to the facts is reviewed *de novo*, without a presumption of correctness. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). A claim that counsel rendered ineffective assistance is a mixed question of fact and law and therefore also subject to *de novo* review. *Id*.; *State v. Burns*, 6 S.W.3d 453, 461 (Tenn. 1999).

When a petitioner seeks post-conviction relief on the basis of ineffective assistance of counsel, he must establish that counsel's performance fell below the range of competence demanded of attorneys in criminal cases. *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). In addition, he must show that counsel's ineffective performance actually adversely impacted his defense. *Strickland v. Washington*, 466 U.S. 668, 693, 104 S. Ct. 2052, 2067, 80 L. Ed. 2d 674 (1984). In reviewing counsel's performance, the distortions of hindsight must be avoided, and this Court will not second-guess counsel's decisions regarding trial strategies and tactics. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982). The reviewing court, therefore, should not conclude that a particular act or omission by counsel is unreasonable merely because the strategy was unsuccessful. *Strickland*, 466 U.S. at 689, 104 S. Ct. at 2065. Rather, counsel's alleged errors should be judged from counsel's perspective at the point of time they were made in light of all the facts and circumstances at that time. *Id*. at 690, 104 S. Ct. at 2066.

A petitioner must satisfy both prongs of the *Strickland* test before he or she may prevail on a claim of ineffective assistance of counsel. *See Henley v. State*, 960 S.W.2d 572, 580 (Tenn. 1997). That is, a petitioner must not only show that his counsel's performance fell below acceptable standards, but that such performance was prejudicial to the petitioner. *Id*. Failure to satisfy either prong will result in the denial of relief. *Id*. Accordingly, this Court need not address one of the components if the petitioner fails to establish the other. *Strickland*, 466 U.S. at 697, 104 S. Ct. at 2069. In cases involving a guilty plea, the petitioner must show prejudice by demonstrating that, but for counsel's errors, he or she would not have pleaded guilty but would have insisted on going to trial. *See Hill v. Lockhart*, 474 U.S. 52, 59, 106 S. Ct. 366, 370, 88 L. Ed. 2d 203 (1985); *Bankston v. State*, 815 S.W.2d 213, 215 (Tenn. Crim. App. 1991).

## IV. Failure to Investigate and Call Witnesses

Petitioner contends that he received the ineffective assistance of counsel because trial counsel did not fully investigate his theory of self-defense and adequate provocation. He argues that counsel failed to call Renee Manning and Larry Wilson to testify that he was

acting in self-defense at the time of the shooting because the victim had a gun. He also felt that they should have been called to refute testimony by the State's witnesses. Petitioner further contends that counsel should have presented evidence that the victim had a reputation for being armed and aggressive.

Initially, we note that Petitioner did not call Ms. Manning and Mr. Wilson to testify at the post-conviction hearing. *See Black v. State*, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990)(concluding that failure to present a material witness at the post-conviction hearing generally results in the failure to establish ineffective assistance of counsel). At the post-conviction hearing, trial counsel testified that Petitioner talked of self-defense, but his version of the facts varied. He had open-file discovery in Petitioner's case, which included copies of statements by Ms. Manning and Mr. Wilson. He made copies of the statements and forwarded them to Petitioner. Trial counsel testified that he asked the investigator, Ms. Byrd, to interview the witnesses, and he gave her a copy of the entire file.

Trial counsel said that if either Ms. Manning or Mr. Wilson had placed a gun in the victim's hand at the time of the shooting, he would have called them to testify at trial. He was reluctant to call either of them to testify because their statements to Ms. Byrd varied with each other and with what they had previously told police. Trial counsel pointed out that Mr. Wilson was not available for police to talk to about the incident until he was under arrest for marijuana charges. He also noted that Mr. Wilson had four or five felony convictions. Trial counsel said Mr. Wilson told police that he did not see the victim with a gun on the day of the shooting; however, he told Ms. Byrd that he had seen the victim with a gun earlier in the day. He testified that Petitioner and Ms. Manning were close friends, and "Renee's is where he made his money." He said that Ms. Manning told police that on the day of the shooting, only Petitioner had a gun. However, she told Ms. Byrd that Petitioner never had a gun. She also said that Petitioner had returned to her apartment after the initial altercation to retrieve his jacket. Trial counsel felt that this was going to bolster the State's theory that Petitioner left and returned with a gun. Trial counsel said that he pointed out inconsistencies in the statements by Ms. Manning and Mr. Wilson to Petitioner, and he told Petitioner that he did not know if the statements would be helpful. He then made a strategic decision not to call Ms. Manning or Mr. Wilson to testify, and Petitioner was aware that he did not intend to call them.

Concerning evidence of adequate provocation, trial counsel testified that the proof at trial indicated that Petitioner left and returned with a gun to finish a physical altercation. He obtained the victim's arrest history and knew that he had a prior conviction for carrying a dangerous weapon and a pending weapons charge. Trial counsel testified that he considered asking Ms. Byrd to go out into the neighborhood to ask about the victim's propensity for violence; however, he did not feel that anyone would be forthcoming with information.

The post-conviction court found that counsel made a tactical decision not to call Ms. Manning and Mr. Wilson at trial. Counsel's trial strategies and tactics will not be second-guessed by this Court. *Hellard*, 629 S.W.2d at 9. The court also noted that Petitioner could not show prejudice because he did not call the witnesses to testify at the post-conviction hearing. The post-conviction court further held that counsel was not deficient nor was Petitioner prejudiced by trial counsel's failure to present evidence of the victim's criminal history and propensity for violence. The evidence presented shows that the victim and Petitioner had an altercation. Petitioner then left, returned with a gun, and shot the victim. Petitioner did not present any proof that the victim was armed at the time of the shooting. The record does not preponderate against the post-conviction court's findings. Petitioner is not entitled to relief on this issue.

## V. Lack of Communication

Petitioner argues that trial counsel failed to adequately meet with him and allow him to be involved in his defense. At the post-conviction hearing, Petitioner claimed that trial counsel did not meet with him or respond to his letters until he contacted the Board of Professional Responsibility and the trial judge. Trial counsel testified that he met with Petitioner on multiple occasions and did not feel that there was any lack of communication. He noted that at trial, during the *Momon* hearing, Petitioner acknowledged that he and counsel had discussed the facts and circumstances of the case on "numerous occasions." Trial counsel testified that he made copies of statements made by Kenia White, Renee Manning, and Larry Wilson and forwarded them to Petitioner prior to trial, and they discussed the content of the statements. He informed Petitioner that the statements by Ms. Manning and Mr. Wilson would not be helpful to Petitioner's case, and he informed Petitioner that it was not worth calling them at trial.

The post-conviction court accredited trial counsel's testimony that he met with Petitioner on multiple occasions, and the court noted that Petitioner acknowledged this fact when he was "Momonized." The court also noted that Petitioner did not offer proof that "additional pretrial communications would have affected the outcome." Petitioner has not shown by clear and convincing evidence that there was any lack of communication by trial counsel. Petitioner is not entitled to relief on this issue.

## VI. Failure to Sufficiently Explain the State's Plea Offer

Petitioner argues that trial counsel failed to adequately advise him concerning the State's plea offer. He was aware that prior to trial, the State made an offer that would have resulted in a sentence of thirteen and one-half years. However, Petitioner claims that he rejected the offer because did not understand why he was being offered that amount of time

for defending himself. He was also under the impression that Renee Manning and Larry Wilson would testify on his behalf. At the post-conviction hearing, trial counsel testified that he advised Petitioner of the State's thirteen and one-half year offer, and he told Petitioner that he might be sentenced to double that amount if he lost at trial. He advised Petitioner that he would not call Mr. Wilson and Ms. Manning to testify at trial because of the inconsistencies in their statements and the fact that Mr. Wilson was a five-time convicted felon.

The post-conviction court found that trial counsel clearly explained the plea offer to Petitioner. The court found:

> Petitioner also testified that he would not take the State's plea offer because he wanted to proceed on his self-defense claim. *Transcript*, p. 12, lines 8-16. The fact that the Petitioner made a conscious decision to reject the offer and proceed down a different course of action proves he understood the State's plea offer.

The record does not preponderate against the post-conviction court's findings. The plea offer was adequately explained to Petitioner, and he chose to reject it. Petitioner is not entitled to relief on this issue.

## VII. Failure to Advise Petitioner Concerning His Right to Testify

Petitioner argues that he was "unexpectedly" required to take the stand at trial and testify on his own behalf because trial counsel failed to call Mr. Wilson and Ms. Manning as witnesses. As a result, he claims that he was "unnecessarily" subjected to cross-examination. However, the record belies this claim. At the post-conviction hearing, Petitioner admitted that trial counsel told him what to "look for" when testifying in his own behalf, and he knew that he would be cross-examined about his prior drug offenses. There was a pretrial hearing to determine if Petitioner's prior convictions would be used to impeach Petitioner's credibility if he chose to testify, and the trial court ruled that the two felony convictions were admissible for that purpose if Petitioner chose to testify. Trial counsel testified that he advised Petitioner to take the stand in his own defense because he was claiming self-defense, and no one, other than Petitioner, placed a gun in the victim's hand at the time of the shooing. He said that Petitioner made the decision to testify, and "he testified to that before in the jury-out Momon hearing." Also, as previously noted, Petitioner was aware before trial that Ms. Manning and Mr. Wilson would not be called as witnesses.

The post-conviction court held that trial counsel called Petitioner to the witness stand "to specifically obtain an answer regarding whether or not the Petitioner was going to testify at trial." The court also noted that Petitioner testified that trial counsel "discussed his

-18-

testimony and what would happen during his cross-examination." The court concluded that Petitioner failed to "prove that trial counsel deficiently informed him regarding his right to testify or that he would have chosen to not testify on his own behalf with additional information." We conclude that Petitioner has failed to show that trial counsel's assistance fell below acceptable standards or that Petitioner was prejudiced by any aspect of his trial counsel's assistance. Petitioner is not entitled to relief on this issue.

## VIII.  Appearance at Trial in Prison Clothing

Petitioner contends that trial counsel's performance was deficient for not providing him the opportunity to appear at trial in civilian clothing rather than prison attire. At the post-conviction hearing, trial counsel testified that Petitioner's clothing was delivered to the jail before trial; however, it was lost. Trial counsel's testimony essentially shows that he then made a strategic decision for Petitioner to appear at trial in prison attire in hopes that the proof would show a close case on whether Petitioner acted in self-defense. Then, if the jurors knew that Petitioner had been in jail awaiting trial, they might give Petitioner some equitable relief and conclude that he had been punished enough.

Every defendant is entitled to a fair and impartial trial. *Willocks v. State,* 546 S.W.2d 819, 820 (Tenn. Crim. App. 1976). The guilt or innocence of a defendant should be decided upon the evidence introduced at trial and not because the defendant, for example, is in custody. *Taylor v. Kentucky*, 436 U.S. 478, 485, 99 S. Ct. 1930, 1934, 56 L. Ed. 2d 468 (1978). Certain practices during a trial may "pose such a threat to the fairness of the fact finding process that they must be subjected to 'close judicial scrutiny.' "*State v. Braden*, 874 S.W.2d 624, 626 (Tenn. Crim. App. 1994), citing *Estelle v. Williams*, 425 US 501, 504 (1976). A defendant, for example, should not be compelled by the State to stand trial dressed in prison clothing. *Estelle*, 425 U.S. at 504, 96 S. Ct. at 1693. As the *Estelle* court noted, "the constant reminder of the accused's condition implicit in such distinctive, identifiable attire may affect a juror's judgment." *Id*., at 504-05.

However, a defendant may choose for tactical purposes to place his custodial status before the jury. *See Holbrook v. Flynn*, 475 U.S. 560, 567, 106 S. Ct. 1340, 1345, 89 L. Ed. 2d 525 (1986). A defendant may hope to appeal to the jury's sympathy through his prison attire. *Id*., at 508, (citing *Andern v. Watt*, 475 F.2d 881, 882 (10th Cir. 1973); *Watt v. Page*, 452 F. 2d 1174, 1176 (10th Cir. 1972)). "[J]urors are quite aware that the defendant appearing before them did not arrive there by choice or happenstance." *Holbrook*, 475 U.S. at 567, 106 S. Ct. at 1345; *Carroll v. State*, 532 S.W.2d 934, 937 (Tenn. Crim. App. 1975).

The trial court did not address this specific issue in the order dismissing the petition, but the court found that the Petitioner lacked credibility, and "where there are conflicts in

testimony, the Court credits the testimony of Trial Counsel." This necessarily includes counsel's testimony that he made the strategic decision for Petitioner to appear at trial in his prison attire in an attempt to gain sympathy from the jury. Trial counsel's decision to reveal that Petitioner was in custody was prompted by legitimate trial strategy, and the record does not preponderate against this finding. *See Hellard*, 629 S.W.2d at 9, citing *United States ex rel. Burton v. Cuyler*, 439 F.Supp. 1173, 1187 (E.D.Pa.1977). Petitioner is not entitled to relief on this issue.

## IX. Failure to Request a Timely Mental Evaluation

Petitioner argues that trial counsel was ineffective for failing to request a mental evaluation prior to trial. He claims that he was heavily medicated at the time of the State's plea offer and during trial and that he was unable to "competently and meaningfully" participate in decisions concerning his defense. However, Petitioner presented no proof at the post-conviction hearing, other than his own testimony, to support his claim. In fact, trial counsel requested a mental evaluation prior to the sentencing hearing. However, as noted by the post-conviction court, Petitioner refused to cooperate with the examiner, and the overall results of Petitioner's psychological testing were not viewed as "valid or reliable." Petitioner has failed to show by clear and convincing evidence how counsel's failure to request a mental evaluation prior to trial constitutes deficient performance. Petitioner presented no expert testimony at the post-conviction hearing or any other evidence to show than an evaluation was necessary before trial. *Black v. State*, 794 S.W.2d at 757. Petitioner is not entitled to relief on this issue.

## X. Failure to Present Proof and Cross-Examine Witnesses at the Sentencing Hearing

Petitioner argues that trial counsel was deficient for failing to cross-examine the State's witnesses at the sentencing hearing or present any proof on his behalf. However, Petitioner has failed to support this claim with argument. In his brief, Petitioner merely alleges: "During the sentencing phase of the trial, Trial Counsel failed to cross examine State witnesses and put on no proof for the Defendant." Petitioner then makes reference to the sentencing hearing transcript in a footnote. The transcript was not included in the record on appeal. An appellant is required to support his or her contentions with argument, references to the record, and citation to authorities. Tenn. R. App. P. 24(b); Ct. Crim. App. R. 10(b). Additionally, "when a party seeks appellate review there is a duty to prepare a record which conveys a fair, accurate and complete account of what transpired with respect to the issues forming the basis of the appeal." *State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993). Therefore, this Court is precluded from considering the issue. *Id*. at 560-61.

In any event, as noted by the post-conviction court and by the State in its brief, Petitioner also failed to present any proof concerning this issue at the post-conviction hearing. He has not shown or even alleged how counsel's performance in this area was deficient or that he was in any way prejudiced by counsel's performance. The Petitioner bears the burden of proving his or her allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). This issue is without merit.

## CONCLUSION

After a thorough review, we affirm the judgment of the post-conviction court.

_____
THOMAS T. WOODALL, JUDGE